UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ARTHUR LEE GATES, JR.,

                 Plaintiff,

           v.                      CAUSE NO.: 3:20-CV-102-RLM-MGG

RON NEAL, et al.,

                 Defendants.

<u>OPINION AND ORDER</u>

Arthur Lee Gates, Jr., a prisoner without a lawyer, moved for a preliminary injunction. He seeks numerous forms of relief in connection with a lower back injury, including a second surgical procedure, recovery in an outside hospital, physical therapy, specific pain medication, a wheelchair, idle pay status, and no urine and blood tests. In the screening order, the court found that he had accrued three strikes under the Prison Litigation Reform Act but that he qualified for the imminent danger exception, and allowed him to proceed on an injunctive relief claim with in forma pauperis status. The Warden has filed a response, arguing that the motion for preliminary injunction should be denied and that Mr. Gates's allegation of imminent danger is not credible.

According to the complaint, Mr. Gates suffers from severe mental and physical disabilities, including complications from back surgery performed by Dr. Riafi in January 2018. On March 15, 2019, Dr. Nancy Marthakis confiscated Mr. Gates's wheelchair and discontinued his prescriptions for blood pressure and pain medication. She explained (Mr. Gates says) that she was retaliating

against him for participating as a witness in a lawsuit against her. He was provided with a walker, which he can't use, and he is unable to walk to the cafeteria. She also relied on a video recording of Mr. Gates involved in a physical altercation with another inmate in the infirmary. Dr. Marthakis refuses to send him to a specialist for an accurate diagnosis and additional surgery, and she refuses to provide him with physical therapy. He further alleges that, because correctional staff refuse to deliver meals to his cell, he "has not eaten since 6/4/19."

To support his allegations, Mr. Gates provided a chronological report with daily entries from June 10, 2019, to January 27, 2020. ECF 4. These entries focus on Mr. Gates's medical treatment and food consumption, and they repeatedly document the allegations in the complaint. The entries also include additional information, including that Mr. Gates received food from other inmates and from correctional staff who delivered food to Mr. Gates's cell on occasion, typically during lockdowns. On November 3, 2019, he refused a food tray because it was cold. He received pain medication, which he occasionally refused, and he also refused housing in the medical dormitory. Correctional staff moved him to another cellhouse so that he would be closer to the cafeteria and moved him again within that cellhouse so that he would be closer to the showers. During this time, he attended church and went to the medical unit on several occasions, though he often refused medical passes. For example, on July 23, 2019, he received two conduct reports for refusing medical passes for mental health and laboratory tests. Mr. Gates told medical staff that he would "never do

labs and they can take [him] to court." On July 25, he went to the medical unit to sign a refusal form.

In response, the Warden provided Dr. Marthakis's statement. According to the statement, on January 17, 2018, Mr. Gates underwent back surgery performed by Dr. Riafi, an outside neurosurgeon, and received multiple sessions of physical therapy from Therapist Bates at the Miami Correctional Facility to recover strength and function. He demonstrated the ability to walk with a rolling walker and to perform home exercises, and Therapist Bates discharged him from the physical therapy sessions. Mr. Gates received antibiotics and followed up on numerous occasions with Dr. Riafi, who recommended continued physical therapy.

In February 2019, Mr. Gates transferred to the Indiana State Prison to get medical care in the infirmary unit for a post-surgical infection. Neurontin was provided to Mr. Gates during his recovery, but wasn't intended for long term use. He also received Topamax for pain and Excedrin for migraines. When medical staff discontinued the Neurontin prescription, Mr. Gates became angry and irate and began to refuse all medications, including those for pain and blood pressure. He also began to refuse laboratory tests, medical appointments, nurse checkups, and continued physical therapy. He demanded medical idle pay and the replacement of his walker with a wheelchair. On April 8, 2019, Topamax was discontinued because Mr. Gates repeatedly refused to take it.

In May 2019, Dr. Marthakis observed Mr. Gates's ability to use his walker appropriately. He received a low gallery pass but refused a transfer to a housing

unit closer to the cafeteria. Dr. Marthakis informed him that extending his use of a wheelchair wouldn't benefit his overall health and would cause him more harm than good. Later in 2019, Mr. Gates continued to refuse physical therapy and extra strength Tylenol. He continued to insist that he needs Neurontin, an appointment with a specialist, medical idle status, and his wheelchair. In Dr. Marthakis's medical opinion, there is no medical reason why Mr. Gates requires a wheelchair or why he can't walk on his own without any assistive devices. She recommends that he continue his home exercise plan and to use over-the-counter medication to manage his pain.

The purpose of preliminary injunctive relief is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." Platinum Home Mortg. Corp. v. Platinum Fin. Group, Inc., 149 F.3d 722, 726 (7th Cir.1998). "In order to obtain a preliminary injunction, the moving party must show that: (1) they are reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest."Joelner v. Village of Washington Park, Illinois, 378 F.3d 613, 619 (7th Cir. 2004).

Under the Eighth Amendment, inmates are entitled to adequate medical care. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. Farmer v. Brennan, 511 U.S. 825, 834 (1994). A medical need is "serious"

if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and if untreated could result in further significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain. Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005).

Deliberate indifference is a high standard, and is "something approaching a total unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." Board v. Farnham, 394 F.3d 469, 478 (7th Cir. 2005). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Jackson v. Kotter, 541 F.3d 688, 697 (7th Cir. 2008). As the court of appeals has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions

will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

Id. at 697-698. Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. Pierson v. Hartley, 391 F.3d 898, 902 (7th Cir. 2004); Walker v. Peters, 233 F.3d 494, 499 (7th Cir. 2000).

A prisoner isn't entitled to demand specific care, nor is he entitled to the "best care possible." Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997). To establish deliberate indifference when the defendants have provided some level of care for a prisoner's medical condition, the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." Hayes v. Synder, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. Ciarpaglini v. Saini, 352 F.3d 328, 331 (7th Cir. 2003).

The record indicates that Mr. Gates has received substantial medical care for his back injury, including consultations with an outside neurosurgeon, back surgery, physical therapy sessions, antibiotic and pain medication, and admission to an infirmary for post-surgical care. He has also received several housing accommodations and assistive devices for walking. Mr. Gates retains access to the home exercise program, a rolling walker, and over-the-counter pain medication.

Dr. Marthakis's opinion and treatment plan are backed by her professional experience medical expertise, and her assessment is consistent with those of Dr.

Riafi, Therapist Bates, and nursing staff. By contrast, Mr. Gates has shown no medical evidence to support his requests for second surgical procedure, recovery in an outside hospital, physical therapy, specific pain medication, a wheelchair, idle pay status, and the discontinuation of laboratory tests. Mr. Gates alleges that the first surgical procedure was botched and a second surgical procedure was ordered, but he doesn't say who ordered it, and the record contains no medical evidence to support either of these allegations. While the record indicates that Mr. Gates needs physical therapy, he received instruction from Therapist Bates and refused to continue the exercises on his own. Though Mr. Gates adamantly denies that these sessions constituted "real physical therapy," this denial is merely an expression of his dissatisfaction with the level of the Therapist Bates's involvement, and there is no medical evidence in this record that a more involved course of therapy is required. The record contains no medical evidence that stronger pain medication is warranted or that a wheelchair is required. Mr. Gates doesn't allege that he has a medical need for idle pay or for the discontinuation of laboratory tests.

Mr. Gates's representations suggest that medical staff had a reasonable basis for their assessment of Mr. Gates's level of pain and ability to walk. For instance, Mr. Gates documents that he refused offers to move to the medical housing unit or a housing unit closer to the cafeteria and for Tylenol. He says he can't walk to the cafeteria, he he attended religious services and went to the medical unit, at least once for the sole purpose of signing a refusal of care form. His description of his recorded physical altercation with another inmate in the

medical unit undermines the allegations of severe pain and inability to walk. The repeated refusals to attend scheduled medical appointments and to undergo laboratory tests undermines the sincerity of Mr. Gates's requests for medical care. In sum, the record doesn't demonstrate deliberate indifference to serious medical needs but instead demonstrates that Mr. Gates disagrees with his medical providers and wants specific types of care. The court cannot conclude that Mr. Gates has shown that he likely to succeed on the merits of his claim.

Mr. Gates asserts that he will suffer irreparable harm without injunctive relief because correctional staff and medical staff are conspiring to murder him. He represents that he can't walk to the cafeteria and that correctional staff refuse to deliver him meals. He further maintains that, as a result, he has not eaten since June 4, 2019, but this allegation is implausible given that he didn't initiate this case until January 2020.[1] Numerous entries in the chronological report indicate that he was delivered meals during lockdown and that other inmates have given him food. These entries are inconsistent with his allegations that he hasn't eaten, and with his conspiracy theory regarding attempted murder. Mr. Gates repeatedly complained in his chronological report about the lack of meal delivery and attempts to starve or murder him, but he rarely complained about hunger and didn't describe weight loss or any other symptoms of severe malnutrition. Mr. Gates also represents that, in November 2019, he refused a

---

[1] Though the extent of the ability to survive without food varies from person to person, the upper limit of survival in well-documented studies is about forty days. See https://www.scientificamerican.com/article/how-long-can-a-person-survive-without-food/; https://www.healthline.com/health/food-nutrition/how-long-can-you-live-without-food#water-intake.

delivered meal because it was cold; it is highly unlikely that a person who hadn't eaten in five months would react that way. Given these extensive credibility concerns, the court can't find that Mr. Gates will suffer irreparable harm absent injunctive relief.

As to the competing and public interests, unnecessary intrusions into the management of prisons are generally disfavored. *See* 18 U.S.C. § 3626(a) (prison-related injunctions must be necessary to remedy the violation and narrowly tailored); <u>Westefer v. Neal</u>, 682 F.3d 679, 683 (7th Cir. 2012) ("Prison officials have broad administrative and discretionary authority over the institutions they manage."). After considering the relevant factors, the court finds that Mr. Gates hasn't shown that he is entitled to injunctive relief, and the motion for a preliminary injunction is denied.

In their response, the Warden also argues that the court should revoke Mr. Gates's in forma pauperis status because he has accrued three strikes under the Prison Litigation Reform Act and his allegation of imminent danger of physical harm is not credible. A prisoner who has accumulated three strikes can't proceed without a full prepayment of the filing fee unless he can establish that he is in imminent danger of serious physical injury. 28 U.S.C. § 1915(g). The court of appeals has explained that "imminent danger" within the meaning of 28 U.S.C. § 1915(g) requires a "real and proximate" threat of serious physical injury to a prisoner. <u>Ciarpaglini v. Saini</u>, 352 F.3d 328, 330 (7th Cir. 2003) (citing <u>Lewis v. Sullivan</u>, 279 F.3d 526, 529 (7th Cir. 2002)). "If a defendant contests a plaintiff's imminent-danger allegations . . . the court must determine the

9

allegations' credibility, either by relying on affidavits or depositions or by holding a hearing." Taylor v. Watkins, 623 F.3d 483, 485 (7th Cir. 2010) (citing Gibbs v. Roman, 116 F.3d 83 (3rd Cir. 1997)). For the reasons already set forth, the court finds that Mr. Gates allegation of imminent danger isn't credible and will revoke his in forma pauperis status.

Finally, Mr. Gates asserts in his reply that he doesn't understand the Warden's response and can't proceed in this case without the assistance of counsel. "[T]here is no constitutional or statutory right to court-appointed counsel in federal civil litigation . . ." Pruitt v. Mote, 503 F.3d 647, 649 (7th Cir. 2007) (en banc). However, in some circumstances, the court may ask an attorney to volunteer to represent indigent parties.

> When confronted with a request under § 1915(e)(1) for pro bono counsel, the district court is to make the following inquiries: (1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?

Pruitt v. Mote, 503 F.3d at 654.

Mr. Gates says he hasn't contacted prospective counsel as previously directed by the court. He offers no explanation as to why he thinks he is incompetent to litigate this case on his own, and his filings to date contradict his broad assertions regarding his competency. Mr. Gates started this case with a twenty-page complaint with exhibits, a motion for preliminary injunction, and a motion seeking contact information for service on the defendants. He also prepared a chronological report documenting his daily experiences with an apparent eye toward litigation given its focus on medical treatment and food

delivery, documentation of potential exhibits and witnesses, use of legal terms such as "retaliation," "imminent danger," and "negligence," and notes on legal strategy. For example, he states, "They're all in it together, so in court, don't allow them to try and get out of it by placing blame on the other when they are all in it together as one." ECF 3 at 6. He also states, "Tell them to prove all they say by video proof and the scanning of my I.D. badge, proof of my being in that chow hall." *Id.* at 42. He further indicates that he pursued a claim under the Indiana Tort Claim Act before filing this case. At this stage of the proceedings, Mr. Gates's only requirement to proceed in this case was to explain how his allegation of imminent danger was credible. Though he was ultimately unsuccessful, it doesn't appear that this lack of success was attributable to his incompetency as a litigator. The court denies the request for recruited counsel.

For these reasons, the court:

(1) DENIES the motion for a preliminary injunction (ECF 5); and

(2) ORDERS Arthur Lee Gates, Jr., to pay the $400.00 filing fee by <u>April 3, 2020</u>.

If Mr. Gates doesn't respond by that deadline, this case will be dismissed without further notice.

SO ORDERED on March 5, 2020

s/ Robert L. Miller, Jr.
JUDGE
UNITED STATES DISTRICT COURT